# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ISAIAH PEREZ-MILLER<br><br>Defendant. | CRIMINAL NO.  25-004 (RAM)(HRV) |

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

On December 23, 2024, defendant Isaiah Perez-Miller (hereinafter "Perez" or "Defendant") was arrested during a police intervention at the parking lot of a bakery in Gurabo, Puerto Rico. The Grand Jury returned an Indictment charging him with possession of a firearm and ammunition by a prohibited person (felon) in violation of 18 U.S.C. § 922(g)(1). (Docket No. 11). Perez moves to suppress the firearm and ammunition seized from his person as well as any statements made following his arrest. (Docket No. 33). The Government opposes. (Docket No. 39).

The presiding District Judge referred the matter to me for report and recommendation. (Docket No. 41). I held an evidentiary hearing on October 21, 2025. (Docket No. 52). For the reasons outlined below, I recommend that the motion to suppress be DENIED.

## II.    Procedural Background

Perez was federally arrested pursuant to a criminal complaint that was authorized on December 25, 2024, and made his initial appearance the next day. (Docket Nos. 1 and 8). The Grand Jury returned the Indictment on January 2, 2025. (Docket Nos 11, 12). Perez pleaded not guilty and was ordered detained pending trial. (Docket Nos 14, 15).

On May 21, 2025, he filed the motion to suppress that is currently pending before the court. (Docket No. 33). The United States filed its opposition on June 20, 2025. (Docket No. 39). The Defendant replied on June 27, 2025. (Docket No. 40). On July 16, 2025, this matter was referred to me "for suppression hearing, if necessary, and a report and recommendation." (Docket No. 41).

Following the parties' several requests for continuances (Docket Nos. 44, 48, and 50), the suppression hearing was finally held on October 21, 2025. (Docket No. 52). At the hearing, the United States presented the testimonies of Puerto Rico Police Bureau ("PRPB") agents Jean Carlos Rivera-Alvarez and Miguel Morales-Cotto. (*Id.*). Several exhibits were received into evidence, including video and photographic evidence. (Docket No. 55). At the end of the hearing, the defense requested that the court not deem the matter submitted until a subpoena that had been served on the PRPB for radio frequency recordings was complied with. (Docket No. 52). The undersigned granted the request and ordered the PRPB to produce the unaltered and continuous audio recordings by no later than October 31, 2025. (*Id.*). Any motion to reopen the evidentiary hearing or post-hearing memoranda had to be filed on or before November 20, 2025. (*Id.*).

On November 20, 2025, the parties filed their post-hearing memoranda with the benefit of the suppression hearing transcript. (Docket Nos. 59, 61 and 66). The parties

also filed on the same date a "Joint Motion Submitting a Stipulated Summary of the Radio Frequency Communications from December 23, 2024." (Docket No. 62).

### III.    SUMMARY OF THE EVIDENCE - PROPOSED FINDINGS OF FACT

1.    Agent Jean Carlos Rivera-Alvarez ("Agent Rivera") has been a PRPB officer for six years. (Suppression Hearing Transcript "Tr.", Docket No. 59 at 10). He is assigned to the Gurabo District and his role as a patrol officer is to conduct preventive patrols in the Gurabo area and to investigate police complaints. (Id.).

2.    On December 23, 2024, Agent Rivera worked the 8:00 p.m. to 4:00 a.m. shift. (Tr. at 12). On that date, he provided backup in a police intervention. (Tr. 11). His participation in the police intervention at issue began at around 9:30 p.m. while he was on patrol on Road 189, heading to a Puma gas station in the municipality of Caguas. (Id.). Agent Rivera was driving an unmarked Puerto Rico police unit and was accompanied by fellow officer Sionet Feliciano. (Id.).

3.    Agent Rivera heard over the police radio channel that units should be on the lookout for an orange KTM motorcycle. (Tr. 12-13). As him and his partner were close to the Puma gas station, they saw a motorcycle that matched the description. (Tr. 13). The only information Agent Rivera received was that the driver was a target and that they were not to intervene at that time with the person. (Id.). He understood the instruction as requiring he and his partner to follow the motorcycle until the officers that had cause to intervene arrived at the scene. (Tr. 13-14). The only information provided in addition to the model and color of the motorcycle was that they (the officers) did not have a license plate, and that the target was wearing a white shirt. (Tr. 21-22).

4.    When the driver of the motorcycle saw the patrol car approach, he took off from the gas station on Road 189 heading towards Gurabo. (Tr. 14). As they followed, Agent Rivera continued to report the location and direction of the motorcycle. (Id.). Agent Rivera testified that a high-speed chase ensued; he and his partner continued following the motorcycle until it turned off on Road 932 heading toward the Gurabo Bakery. (Tr. 15-16).

5.    Several motorcycles were parked at the Gurabo Bakery, where the orange KTM motorcycle briefly stopped close to a dumpster. (Tr. 16). Because Agent Rivera had no cause to intervene with the motorcycle nor did he have any information about the person the police was looking for, he continued on his way. (Tr. 17). When he turned around, he saw the motorcycle take off again toward Road 189. Agent Rivera started to follow again and to report the location. (Id.). The reporting was not done to any agent in particular, but over the radio frequency to any fellow officers listening. (Tr. 21).

6.    Agent Rivera lost sight of the motorcycle at the intersection with Road 9944. (Tr. 18). He testified announcing over the radio that he lost sight of the motorcycle. (Tr. 36). He and his partner returned to the Gurabo Bakery, and when they got there, a person was under arrest. (Tr. 18). From the time Agent Rivera informed that he had lost sight of the motorcycle, to the time he heard that they had someone under arrest, less than a minute had passed. (Tr. 23).

7.    Agent Rivera was shown Exhibit 5, a still image of the security camera video of the Gurabo Bakery location starting at 10:22 p.m. (Id.).  He was able to identify the area, the motorcycle he followed on December 23, 2024, other motorcycles in the area, as well as the patrol vehicle he drove that night. (Tr. 18-20).

8.    On cross examination, Agent Rivera admitted that all the information he had was that the police was looking for an orange motorcycle and an individual with a white shirt. (Tr. 25). It was around 9:30 p.m. when he spotted the motorcycle at the Puma gas station on Road 189 in Caguas. (Id.). The driver of the motorcycle he followed, however, had a red shirt. (Tr. 26).

9.    Agent Rivera was also shown Exhibit A, a map of the area, and was asked to pinpoint some of the locations he testified about. (Tr. 29). He identified the Puma gas station, the direction of the motorcycle after it took off, the location where the motorcycle accelerated, and the Gurabo Bakery. (Tr. 29-32; Exhibit A-1).

10.    Exhibit 5 was then played for Agent Rivera. (Tr. 32). At 10:23:25, the motorcycle is seeing arriving at the Gurabo Bakery. (Id.). The driver of the motorcycle is not wearing a helmet. (Tr. 32-33). At 10:23:52, Agent Rivera said that moment is when the motorcycle turns around and takes off again. (Tr. 34). The map depicted in Exhibit A-1 does not show Road 9944 where Agent Rivera lost sight of the motorcycle. (Tr. 35).

11.    On redirect, Agent Rivera reiterated that he indeed received information over the radio that the person driving the motorcycle agents were looking for was wearing a white shirt, (Tr. 37), but that the person he followed was wearing a red shirt. (Tr. 36). Exhibit 5 was paused at 10:23:04 and Agent Rivera was asked if he could see the color of the two motorcycles that appeared in the frame. Agent Rivera answered: "They look orange . . . Orange, red, like an orange red or reddish orange." (Tr. 38-39). Both motorcycles in the video, the one he followed and the one parked at the Gurabo Bakery, looked orange. (Tr. 40). Agent Rivera never relayed any information over the radio regarding what the person on the motorcycle that he followed was wearing. (Tr. 41).

12.    The Government's second witness was PRPB agent Miguel Morales-Cotto ("Agent Morales"). Agent Morales works at the Criminal Intelligence Unit and has been a police officer for fifteen (15) years. (Tr. 43). He has acquired experience in

firearms detection through the multiple (more than 50) interventions he has participated in his career as a police officer. He also received firearms training at the police academy. (Id.).

13.     On December 23, 2024, Agent Morales participated in a surveillance and arrest. (Tr. 44). That day, he began working at 9 a.m. (Id.). In the afternoon, fellow officers from the Bayamón arrest division met with him at the intelligence unit in Caguas. (Id.). The arrest division agents from Bayamón requested backup as part of an operation to arrest Harrelson Marrero ("Marrero"). (Id.). A state arrest warrant had been issued for Marrero; he was sought for several murders in the town of Corozal. (Id.). The arrest division agents had received information that Marrero resided in and had ties to Caguas. (Id.).

14.     The Bayamón arrest division agents requested the assistance of the Caguas intelligence unit agents because they were more familiar with the area. (Tr. 45). Agent Morales was informed of the places Marrero resided at or frequented, and the vehicles he used. (Id.). Agent Morales was told that Marrero was believed to be connected to the Morales Ward and Los Flamboyanes Condominium, both in Caguas, and that he drove an off-road white and orange KTM motorcycle registered to his name. (Tr. 45-46).

15.     Government's Exhibit 1 is a mugshot of Marrero. Exhibit 3 is a printout of the Puerto Rico Department of Public Works DAVID system showing that a 2018 orange KTM motorcycle is registered to Marrero. (Tr. 46-48). Government's Exhibit 2 is the warrant issued for Marrero's arrest. (Tr. 49). These are the documents that were shown to Agent Morales so that he was able to provide support in the work plan to apprehend Marrero. (Id.).

16.     Once Agent Morales and his fellow officers received a briefing from the Bayamón arrest division unit, they headed out to conduct surveillance to see if they could find Marrero. (Id.). Agent Morales was specifically assigned to conduct surveillance at the Los Flamboyanes condominium, the place where the investigation revealed Marrero's consensual partner lived. (Tr. 49-50). Six agents went to conduct the surveillance, two of which were from Caguas, including Agent Morales. (Tr. 50). Approximately six agents were sent to the Morales Ward. (Id.).

17.     Agent Morales headed out to conduct surveillance at around 6:30 p.m. in plain clothes and driving an unmarked vehicle. (Id.). Agents communicated through radio and cell phone. (Id.). The instructions were that if Marrero was spotted, he was to be arrested immediately. (Id.). Through surveillance, the agents were hoping to see Marrero, his consensual partner, or any of the vehicles associated to him. (Tr. 51-52). The surveillance at Los Flamboyanes did not yield any sightings of Marrero or his consensual partner. (Tr. 52).

18.    Agents at the Morales Ward, however, spotted Marrero's brother-in-law and decided to follow him to see if the latter would lead them to Marrero. (Id.). The fellow officers, following the brother-in-law, transmitted their location through radio. (Tr. 53). They followed a white vehicle until it reached the Villa Blanca neighborhood in Caguas. (Id.). It was approximately 10:00 p.m. when agents communicated that the young man met up with another individual who was riding a motorcycle. (Id.). They communicated through radio that the individual in the motorcycle matched Marrero's description. (Tr. 54).

19.    At this point, Agent Morales' supervisor instructed him to get close to the Villa Blanca area because the agents reporting the observations were not familiar with the neighborhood and it had many different places where vehicles could enter and exit if they began to move. (Id.). Agent Morales communicated via radio that he was on his way to Villa Blanca but that he was going to enter through a different area he knew of. (Tr. 55). I took him six or seven minutes to go from Los Flamboyanes to Villa Blanca. (Id.).

20.    As Agent Morales was on his way to the other entrance he testified about, he observed a gentleman driving a motorcycle at high speed on Luis Muñoz-Marin Avenue in the direction of Rafael Cordero Avenue. (Tr. 56). The motorcycle "looked like" the one Marrero had registered to his name; it was orange and white. (Id.). Subsequently, when Agent Morales arrived at the area where he had been told the brother-in-law met with the individual driving the motorcycle, he told the other officers that the white vehicle was there still, but the motorcycle was not. (Tr. 57). Agent Morales relayed this information through radio and asked all units to be on the lookout for it. (Id.).

21.    Agent Morales explained that he decided not to follow the motorcycle he saw as he entered the Villa Blanca subdivision because he was not one hundred percent sure it was the same one and wanted to have confirmation. (Id.). Once he saw that the brother-in-law's vehicle was still there but not the motorcycle, he communicated the information over the radio and went to meet in person with his fellow officers. (Tr. 58).

22.    Shortly thereafter, it was transmitted over the radio that a fellow patrol officer had spotted a motorcycle with similar characteristics at the traffic light of Road 189, intersection with Luis Muñoz Marin Avenue. (Tr. 59). The distance between where the agents were meeting and where the similar motorcycle was spotted is approximately one to 1.5 kilometers. (Id.). All radio communications were transmitted using the Caguas 1 radio frequency, which can be heard by the whole police force of the Caguas area. (Id.).

23.    Agent Morales then headed towards the location and told his fellow patrol officer to continue to report over the radio while they were following the motorcycle. (Tr. 60). Eventually, the patrol officer said that he had reached the

Rincon Bakery in Gurabo and that the motorcycle had "parked" at that location. (Id.). Agent Morales responded that he was about to arrive to that location in a couple of seconds. (Id.). The fellow officer said that he was going to be withdrawing and leaving the area so as to not cause the individual to get nervous and flee if he was the target. (Tr. 61). That was the last communication Agent Morales received from the patrol officer that was following the motorcycle. (Tr. 62-63).

24.     Agent Morales arrived after a couple of seconds and saw that there was an orange and white motorcycle parked with a gentleman "like leaning on it." (Id.). Agent Morales drove by and continued his way. He turned around further down the road where the bakery is located. (Id.). Agent Morales met up with fellow officers, "door to door," and told them that there was a motorcycle matching the same characteristics, but he did not have confirmation it was Marrero. (Tr. 62). Agent Morales decided to conduct a field investigation to corroborate. (Id.). The purpose of a field interview was to corroborate if the person slouching over the motorcycle was the target, Marrero, or another person. (Id.). It took Agent Morales approximately a minute after he arrived to turn around his car and decide he was going to conduct the field interview. (Tr. 73).

25.     Agent Morales did not hear any additional communications from the officer that was following the motorcycle. (Tr. 74). However, it should be noted that Exhibit 5 shows when Agent Morales' unmarked vehicle turns right to the road leading to the Gurabo Bakery as the patrol car of Agent Rivera is entering the main road. They could not miss each other.

26.     Agent Morales parked his unmarked vehicle and approached the gentleman leaning over the white and orange motorcycle. (Id.). He identified himself as a police officer since he was visibly wearing his police credentials. (Id.). Agent Morales did not take his radio equipment with him when he stepped out of his vehicle. (Id.).

27.     The motorcycle that Agent Morales saw parked at the area of the Gurabo Bakery was, according to him, very similar to the one registered to Marrero in both color and structure. (Tr. 75). Before he got out of his vehicle, he saw the motorcycle at a distance of approximately twenty (20) feet. (Id.). The illumination in the area was "fine;" "there was good lighting." (Tr. 76).

28.     To corroborate whether the individual leaning over the motorcycle was Marrero or not, Agent Morales was going to interview the person, ask for his identification, and compare his physical features with the description he had from observing the photographs. (Tr. 76). The first time Agent Morales saw the face of the person when he was "quite close to him already." (Id.). From the moment Agent Morales started walking toward him and identified himself as a police officer, the gentleman remained leaning on the motorcycle looking down. (Tr. 77).

29.     Agent Morales asked the individual what his name was. (Tr. 78). Still looking down to the ground, the individual told Agent Morales that his name was Isaiah but made no effort to establish eye contact with the agent. (Id.). Agent Morales asked to see an identification to corroborate that his name was indeed Isaiah. (Id.). Then, Agent Morales saw Isaiah make a movement with his right arm. (Id.).

30.     As Isaiah pulled something out of his pocket, Agent Morales saw in the area of his waist what appeared to be a firearm. (Tr. 79). He could see "like the mark of a grip of a pistol." (Id.). The individual was wearing a shirt over his pants. (Id.). The grip of a pistol became noticeable once he moved his arm backward. (Id.). Agent Morales then asked Isaiah if he had a permit to carry a firearm and he said he did not. (Id.). At that moment, and for safety reasons, the agent told Isaiah to place his hands over the motorcycle and informed him that he was going to place him under arrest. (Id.).

31.     When Agent Morales asked him to cooperate and put his hands on the motorcycle to be able to place him under arrest, Isaiah became "somewhat evasive" and started questioning why. (Tr. 80). Agent Morales decided to act quickly and grabbed the pistol. (Id.). Isaiah tripped and fell to the ground, and it was at that time that Agent Morales was able to grab the pistol and put him under arrest. (Tr. 80-81). Agent Morales identified Perez in open court as the person he arrested the night of December 23, 2024. (Tr. 81).

32.     The firearm seized from Isaiah was a Glock pistol. He was also wearing a fanny pack. (Tr. 82). Additional magazines loaded with rounds of ammunition were found inside the fanny pack. (Id.).

33.     Agent Morales was shown the video marked as Government's Exhibit 5, starting at 10:25:25. (Tr. 82). At 10:26:12, the agent sees himself arrive in a black vehicle. (Tr. 83). He was the driver. (Id.). At 10:26:31, Agent Morales appears walking toward the man leaning on the motorcycle. (Tr. 84). At 10:26:46, the agent testified that the video depicts the arm movement that he mentioned during his direct testimony was the moment he was able to see the "mark from the pistol." (Tr. 85). The video also shows that Perez pulled out a cellphone. (Id.). At 10:27:35, the videos shows when Agent Morales placed Perez under arrest. (Tr. 86). At 10:28:17 the video shows when his fellow officers intervened with another individual that was next to Perez. (Tr. 87).[1]

---

[1] Agent Morales testified that for safety reasons, police officers intervened with the other individual as well. (Tr. 81). The person had a firearm. (Id.). After the officers were able to corroborate that he had a valid firearms permit, the gentleman was given back his gun and allowed to leave. (Id.).

34.     Agent Morales further testified that the fellow officer that followed the motorcycle during the operation was Agent Rivera, and that the latter was not part of the original plan. (Id.).

35.     On cross examination, Agent Morales stated that he handed the case over to the ATF. (Tr. 89.) He was the one who made the call to the federal agents since he has several contacts. (Tr. 89-90). He prepared an incident report and took some photographs of the intervention. (Id.).

36.     As an officer assigned to CIC Caguas, Agent Morales primarily focuses on violent crimes and drug offenses in the area of Caguas. (Tr. 90). Performing stops or arrests is part of his duties, as long as there is reasonable cause, a warrant is in effect against the person, or there is a motive to intervene. (Id.). Part of his duties include providing assistance to other divisions of the PRPB "as long as they require it." (Tr. 91). And that is what happened in this case in relation to the operational plan to arrest Marrero. (Id.).

37.     Agent Morales was shown Exhibit 3. The personal data of Marrero in the document includes that he is 5'3 and light skinned. (Tr. 93). He was also shown Exhibit B, a photograph. Agent Morales stated that it was Marrero and that in the photograph he looked more or less like the other photographs Caguas agents were shown. (Id.).

38.     On December 23, 2024, as part of the operational plan, there was no arrest warrant for Perez, only for Marrero. (Tr. 94). Agent Morales did not have photographs of Marrero with him in the undercover car. (Id.).

39.     At Villa Blanca, the information he had from the surveillance conducted by fellow officers was that Marrero's brother-in-law had met up with a man in a motorcycle. (Tr. 94-95). When Agent Morales arrived, he saw a white and orange motorcycle leaving Villa Blanca. (Tr. 96). The agent could not see anything about the person on top of the motorcycle, not even the color of his shirt. (Id.).

40.     When asked if he knew why the fellow agents did not follow the motorcycle as it left the Villa Blanca area where it had met up with the brother-in-law, Agent Morales clarified that they had observed the interaction after they passed once by the residence where the vehicles had parked. (Tr. 98-99). However, to avoid being detected during a second pass by, the fellow officers told Agent Morales the location and asked him to drive by instead. (Tr. 99).

41.     At some point later, a radio communication was sent to all units to be on the lookout for an orange and white KTM motorcycle. (Tr. 99). After descriptions were broadcasted over the radio, a fellow patrol officer communicated that he had a vehicle that matched the same description at the traffic light between road 189 and Luis Muñoz-Marin Avenue in Caguas. (Id.). Agent Morales does not

remember if the fellow patrol officer said something about the individual wearing a red shirt. (Tr. 100). Eventually, Agent Morales arrived at the parking area of Gurabo Bakery. (Tr. 101).

42.     Defense counsel showed Agent Morales a portion of Government's Exhibit 5, the video. (Id.). Agent Morales agreed that the video shows an orange motorcycle turning right from the intersection with Road 189 and a patrol unit following it. (Tr. 101-102). The motorcycle is then observed (at 10:23:38) going in circles and then leaving the Gurabo Bakery area. (Tr. 102). Agent Morales said that the young man on the motorcycle was wearing a shirt that "could be red, it could be orange. It's dark in color." (Id.). He also sees on the video who he already identified as Perez wearing a blue shirt. (Id.). Agent Morales is also able to see that the white and orange motorcycle, the one driven by the individual with the shirt that could be red or orange, turns right on Road 189. (Tr. 105). At no point the video shows the person driving the white and orange motorcycle get off of it or interact with Perez. (Tr. 111).

43.     Agent Morales did not hear over the radio that the white and orange motorcycle had left the Gurabo Bakery area, nor that Agent Rivera lost sight of it in the town of Gurabo. (Tr. 107). At 10:24:25 of Exhibit 5, Agent Morales is seeing arriving at the Gurabo Bakery from Road 189. (Tr. 108). By 10:26:20, when Agent Morales gets out of his car and walks over, he did not observe Perez doing anything illegal. (Tr. 114). Perez did not seem suspicious to him at that moment. (Id.).

44.     Defense counsel showed Agent Morales Exhibits C, D, and E. (Tr. 116). These are photographs taken by Agent Morales. (Id.). They are photographs of Perez after he was arrested showing how Perez was dressed that night. They also show the motorcycle he was resting his arms on. (Tr. 117). When asked if it was a KTM motorcycle, agent Morales answered that he did not know. (Id.). When asked if the motorcycle looked red to him, the agent said it was orange. (Id.). The agent also testified that one of the photographs shows the scooter that he mentioned earlier in his testimony but does not know who it belongs to. (Tr. 118). Perez told Agent Morales at the scene that it belonged to him; however, it is not registered to his name. (Id.). Therefore, it was seized but eventually returned to Perez' father. (Tr. 119).

45.     Upon being shown Exhibit E, Agent Morales acknowledged that Perez is black. (Id.). In his incident report, Agent Morales listed Perez as being 5'8. (Id.).

46.     Back on Exhibit 5 at 10:26:44, Agent Morales is five or six feet away from Perez. He can see that Perez is black and that he is calm and compliant. The agent is asked whether he still did not know that the person was not Marrero. (Tr. 123). By then, Agent Morales knew the gentleman was not Marrero, however, he needed to perform a "broad corroboration" to rule out that Marrero had not left the

motorcycle there and departed in a different vehicle. (Tr. 124). When he asked Perez for his identification, it is possible that Perez may have offered his cannabis license. (Tr. 125). However, Agent Morales clarified that he needed to see a driver's license. (Id.).

47.     Agent Morales would not have arrested Perez if he had refused to provide his identification but mentioned that, depending on how cooperative or uncooperative he had been, he could have been arrested for obstruction of justice. (Tr. 125-26). At 10:26:52, Perez is seen pulling out his phone. (Tr. 126). At around 10:27:05, Agent Morales touches Perez' stomach area. (Tr. 130). It is at second 44 that the agent noticed the firearm. (Tr. 131).

48.     Perez tripped when Agent Morales had his arm on him. (Tr. 133). The person next to Perez was also arrested and searched by a fellow police officer. (Id.). At 10:27:50, his fellow officer is putting the other man on the ground and is later seen unloading the firearm he found. (Tr. 134). At 10:29:34, items, including the firearms, are being put on top of the motorcycle. (Tr. 134-35).

49.     On redirect, Agent Morales explained that despite realizing that Perez was not Marrero, he continued the investigation pursuant to the cause that was transferred to him by the fellow officer when the latter informed that the bike was parked there. (Tr. 136). The agent was looking to corroborate whether it was the same motorcycle or not, and whether it in fact belonged to Marrero. (Id.). Agent Morales was trying to determine if Marrero had left motorcycle there and left in another vehicle. (Tr. 136-37). He also requested identification to corroborate if the person (Isaiah) was who he claimed to be. (Tr. 137). After the agent noticed the firearm on Perez' waist, the interaction changed from an interview to corroborate information into an intervention for a weapons violation. (Tr. 137-38).

50.     On re-cross, the agent was asked if at any time Perez's blue sweatshirt was tucked into his pants. (Tr. 140). Agent Morales answered no. The shirt was not a crop top. (Id.).

51.     The undersigned asked Agent Morales if when he saw what appeared to be a weapon the first time, he saw the shape of it or the actual object. (Id.). When Perez moved his armed backward, the grip of the weapon showed through; "the shape of it showed through." (Id.). He saw the silhouette of it, but the gun was still underneath the shirt. (Id.).

## IV.    APPLICABLE LAW AND DISCUSSION

In his motion to suppress, Perez argues that Agent Morales' warrantless intervention with him on December 23, 2024, was unlawful under the Fourth

Amendment since the officer lacked reasonable articulable suspicion. (Docket No. 33). According to the Defendant, once agents realized he was not Marrero, they should have immediately ended the encounter as there was no legal basis to justify the investigatory stop. Perez further claims that when agents approached him and asked for his identification, it was not a consensual encounter because an objectively reasonable person in his shoes would not have felt free to terminate the same and walk away. Defendant contends that, even if the initial interaction was lawful, once he showed his identification, the intervention should have ended. Perez denies that any object, let alone a firearm, could be seen in his waistband in plain view. Therefore, even if the stop was justified at its inception, there was no particularized objective basis for the PRPB officer to suspect that he was armed and dangerous.

The United States counters that PRPB agents had reasonable suspicion to conduct a *Terry* stop of Perez based on real-time intelligence and observations. (Docket No. 39). The decision to stop Perez, the Government further posits, "was grounded in [sic] a sequence of specific, articulable facts which, when viewed together, supported a reasonable suspicion that he was Marrero, a fugitive subject to an active arrest warrant." (*Id.* at 6). It is also asserted that a mistake of fact, which is what the Government claims occurred when PRPB agents intervened with someone they thought could be Marrero, does not render the stop unconstitutional because the Fourth Amendment does not demand omniscience perfection. (*Id.*). Moreover, the Government's position can be summarized by the following averment:

> Agent Morales acting on real-time surveillance of a fugitive
> wanted for murder, observed a man standing next to a very
> similar motorcycle in the exact location Marrero was last seen.

> Though Morales ultimately detained the wrong person, his decision was shaped by unfolding intelligence, shared communications with other officers, and the fugitive's prior use of a similar colored and model motorcycle.

(*Id.* at 7). With respect to the seizure of the firearm, it is the Government's contention that Agent Morales saw a firearm tucked in Perez' waistband "in plain view" while standing in close proximity to him. The observation, coupled with Perez's statement that he did not have a firearms permit, gave Agent Morales probable cause to arrest for a weapons law violation.  A protective frisk would have been nevertheless justified, says the Government, even if all Agent Morales saw was "what appeared to be an object resembling a firearm." (*Id.* at 11). Lastly, the United States argues that the search of the fanny pack was lawful as a search incident to an arrest and that suppression is unwarranted absent a finding of bad faith. (*Id.* at 14-15).

In their post-hearing memoranda, the parties argue from their perspectives what the evidence presented at the suppression hearing establishes. It should be noted that both the Government and the Defendant had to slightly adjust their factual and legal positions because the evidence that developed during the hearing differed somewhat from what the parties proffered in their pre-hearing pleadings. For its part, the Government maintains that suppression is not warranted because under the totality of the circumstances, the field interview Agent Morales conducted to Perez was a lawful consensual encounter that quickly developed into a probable cause arrest when the agent observed in plain view a firearm in Defendant's waistband. According to the Government, the field interview Agent Morales conducted to corroborate if the individual he saw

resting his arms on a motorcycle that matched the description of the one registered under Marrero's name, was indeed him, did not infringe upon Perez' Fourth Amendment rights.

Perez, on the other hand, claims that Agent Morales should not have approached him at all because he knew that the suspect they were pursuing had left the Gurabo Bakery area in the motorcycle. Alternatively, even if PRPB agents could approach and surround Perez, he argues that Agent Morales' testimony that he saw the silhouette of the firearm in plain view is not credible. In addition, Perez maintains that officer safety cannot justify the pat down and frisk conducted inasmuch as Agent Morales did not have any particularized reason to suspect that Perez was dangerous or engaged in wrongdoing. Perez further avers that the observation of the "silhouette" of a firearm grip under the hoodie of a person who was compliant with officer instructions, is not enough. Defendant contends that his position is bolstered by the agents' actions in arresting and searching the other individual that was next to him.

## A. Legal Framework

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend IV. A criminal defendant seeking to suppress evidence bears a threshold burden of showing that a Fourth Amendment violation occurred, which in turn encompasses the burden of establishing that he or she was subjected to a warrantless search or seizure. *See United States v. Young*, 835 F.3d 13, 19 (1st Cir. 2016); *see also United States v. Fields*, 823 F.3d 20, 25 (1st Cir. 2016). Once the defendant establishes that a warrantless search or seizure occurred, the burden shifts to the Government to prove by a preponderance of the evidence that said search or seizure was lawful. *United*

*States v. Matlock*, 415 U.S. 164, 177, n.14 (1974); *United States v. Delgado-Perez*, 867 F.3d 244, 250 (1st Cir. 2017).

Warrantless searches and seizures are *per se* unreasonable unless they fall within one of the "few specifically established and well-delineated exceptions" to the Fourth Amendment warrant requirement. *Katz v. United States,* 389 U.S. 347, 357 (1967). The Fourth Amendment is enforced through the exclusionary rule by prohibiting the Government from using at trial evidence that constitutes the fruits of an unreasonable search or seizure. *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).

A Fourth Amendment seizure occurs when the police "has in some way restrained the liberty of a citizen" through "physical force or show of authority." *Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968); *see also United States v. Sealy*, 30 F.3d 7, 9 (1st Cir. 1994). Thus, "[t]he protections of the Fourth Amendment apply not only to traditional arrests, but also to those brief investigatory stops generally known as Terry stops." *United States v. Camacho*, 661 F.3d 718, 724 (1st Cir. 2011). Under *Terry*, an officer may stop and briefly detain a person if the officer has reasonable suspicion based on articulable facts, and considering the totality of the circumstances, that criminal activity is afoot. *See United States v. Sanchez*, 817 F.3d 38, 42 (1st Cir. 2016). Reasonable suspicion as a concept defies exact definition, but this much we know: "it requires more than a hunch but less than probable cause." *United States v. Pavao*, 134 F.4th 649, 655 (1st Cir. 2025) (quoting *United States v. Ruidiaz*, 529 F.3d 25, 29 (1st Cir. 2008)). "[A] finding of reasonable suspicion must be premised upon a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Pontoo*, 666 F.3d 20, 27-28 (1st Cir. 2011) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Put

differently, there must be "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Cortez*, 449 U.S at 417.

If the Court finds that the initial interference with a defendant was justified, the Court must then ask, "whether an ensuing search was 'reasonably related in scope to the circumstances which justified the officers' initial interference.'" *United States v. Ivery*, 427 F.3d 69, 72 (1st Cir. 2005) (quoting *United States v. Nee*, 261 F.3d 79, 83 (1st Cir. 2001)). The reasonableness of a search following a *Terry* stop, in the form of a protective frisk or pat-down for weapons, depends on whether the officer is justified in believing that "the person is armed and dangerous to the officer or others." *United States v. Camacho*, 661 F.3d at 728 (quoting *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004)). An officer's decision to frisk is judged "against an objective standard: would the facts available to" them "'warrant [persons] of reasonable caution in the belief'" that the action[s] taken w[ere] appropriate?" *United States v. Guerrero*, 19 F.4th 547, 554 (1st Cir. 2021) (quoting *Terry*, 392 U.S. at 21-22).

Furthermore, the Fourth Amendment's prohibition against unreasonable seizures require that formal arrests be based on probable cause. *Beck v. Ohio*, 379 U.S. 89, 91, 85 (1964); *United States v. McFarlane*, 491 F.3d 53, 56 (1st Cir. 2007) ("An arrest does not contravene the Fourth Amendment's prohibition on unreasonable seizures so long as the arrest is supported by probable cause."). "Law enforcement officers may effect warrantless arrests provided that they have probable cause to believe that the suspect has committed or is committing a crime." *United States v. Martinez-Molina*, 64 F.3d 719, 726 (1st Cir. 1995) (citations omitted). "Probable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts", *Illinois v. Gates*, 462 U.S.

16

213, 232 (1983), and considering the totality of the circumstances. *United States Jones*, 432 F.3d 34, 41 (1st Cir. 2007). The inquiry focuses on what the officers knew at the time of the arrest. *United States v. Brown*, 169 F.3d 89, 92 (1st Cir. 1999). "A *Terry* stop may lead to probable cause for arrest when 'the circumstances giving rise to reasonable suspicion' are combined with 'the developments that unfold[] during the Terry stop.'" *United States v. Dancy*, 640 F.3d 455, 461 (1st Cir. 2011) (quoting *United States v. Lee*, 317 F.3d 26, 32 (1st Cir. 2003)).

**B.    Analysis**

### 1. *The initial intervention with Perez was supported by reasonable suspicion*

Here, the totality of the circumstances indicate that Agent Morales had reasonable suspicion, based on articulable and particularized facts, to approach and conduct a field interview of Perez. There is no dispute that Agent Morales and his fellow officers were providing support in a work plan to arrest Marrero, an individual accused of murder. Officers conducted surveillance in places that were connected to, or frequented by, Marrero. They communicated through radio and cell phone. Agents eventually followed and were able to observe Marrero's brother-in-law speaking to an individual whom they believed was Marrero since the motorcycle driven by the latter matched the description of the one registered to Marrero—an orange and white KTM motorcycle. Agent Morales went to the area (Villa Blanca), and as he was about to enter the residential development, he saw an orange and white KTM motorcycle drive away at high speed.

To corroborate whether the individual on a motorcycle that his fellow officers indicated was speaking with the brother-in-law was still there, Agent Morales drove by.

As he did so, the agent learned that the person and the motorcycle were no longer there. He broadcasted through radio to all units to be on the lookout for the white and orange KTM motorcycle. At this point, Agent Rivera appears to inform his fellow officers that he sighted a vehicle matching the description and was following closely. Agent Rivera reported the locations and eventually lead Agent Morales and other officers to the area of the Gurabo Bakery.

The evidence on record shows that when Agent Morales arrived at the Gurabo Bakery area, there was a breakdown in the radio communications. The video (Exhibit 5) shows the suspected motorcycle arriving at the Gurabo Bakery area but leaving shortly thereafter. The video also corroborates what Agent Rivera testified that he followed the motorcycle as it left the area. Agent Morales' unmarked vehicle crosses paths with Agent Rivera's patrol car. However, the video demonstrates that Agent Morales missed the motorcycle by several seconds (approximately 28 seconds), that is, from 10:23:48 when the motorcycle leaves the area, to 10:24:16 when the unmarked vehicle is seen in the frame for the first time. Immediately thereafter, Agent Morales observes a white and orange motorcycle similar to the one they were looking for parked in the area. He testified that he was not sure if the person leaning over the motorcycle could be Marrero as he drove by. He decided to conduct a field interview to corroborate.

As he stepped out of his vehicle to approach Perez, who was still looking down as depicted in the video, Agent Morales said that he left his radio in the car. The timing of these events confirm that he would not have heard when Agent Rivera notified over the radio that he had lost sight of the suspect in the motorcycle. Agent Morales thus credibly testified that he believed the motorcycle parked at the Gurabo Bakery with similar

characteristic could be connected to the investigation. For that reason, I cannot accept the Defendant's categorical assertion that Agent Morales "knew the suspect-motorcycle had left the area . . . [and] was no longer at the Gurabo Bakery." (Docket No. 66 at 12). I do agree with the Defendant, however, that Agent Morales must have realized as he got closer that the person resting his arms on the motorcycle was not Marrero. Simply put, Perez's physical characteristics did not match—not even a little— with those of Marrero, which Agent Morales and his group had been briefed about earlier that day.  But contrary to Perez's position, that realization did not legally require that the police officers immediately cease their investigative efforts.

The second reason offered by Agent Morales, namely, that he wanted to investigate further the presence of the motorcycle at the Gurabo Bakery and to rule out the possibility that Marrero could have left it there and departed by way of other means is plausible. After all, in the last relevant radio communication, Agent Morales heard that the motorcycle had stopped at the Gurabo Bakery and, supposedly, that Agent Rivera was going to withdraw from the area so as to not alert the target.[2] The testimonial and video evidence also demonstrates that Agent Morales left his radio in his car when he got out of it. Therefore, he could not possibly have heard any additional communications by

---

[2]    I am troubled by the fact that the radio frequency evidence does not back up this latter statement. (Docket No. 62). At best, the radio announcement was made but for some reason not recorded. At worst, it is a fabrication by Agent Morales. Assuming favorably to Perez that this statement was never made, it does not alter my findings and conclusions regarding reasonable suspicion because there is no evidence affirmatively showing that Agent Morales was aware that the KTM motorcycle followed by Agent Rivera had left the area. If the evidence had been so, I would have to agree with the defense that Agent Morales would have had absolutely no basis to approach Perez. But the withdrawal statement is not material to the reasonable suspicion determination.

Agent Rivera. And the motorcycle was a key component in the operational plan to apprehend Marrero.

In sum, because Agent Morales was not sure when he first drove by if the individual resting his arms on the white and orange KTM motorcycle was Marrero, he was justified under the totality of the circumstances, the relevant chain of events, and the collective knowledge of the officers involved,[3] in approaching said individual. Again, Agent Morales saw a male leaning over a motorcycle with the same characteristics of the target vehicle, which thus led him and was within the bounds of the law to conduct a field interview, within that permitted by the law, regarding the presence of said motorcycle in the area. The uncertainty of whether or not the PRPB officers were dealing with Marrero, or the exact same motorcycle, does not foreclose a finding that reasonable suspicion existed. This is so because, "reasonable suspicion is more a concept than a constant: it deals with degrees of likelihood, not with certainties or near certainties . . . [and] makes due allowance for police officers to draw upon their experience and arrive at inferences and deductions that may well elude an untrained person." *United States v. Arnott*, 758 F.3d 40, 44 (1st Cir. 2014) (internal quotation marks and citation omitted); *see also Ruidiaz*, 529 F.3d at 29 ("[R]easonableness requires a practical, commonsense

_____

[3]    "The First Circuit Court of Appeals has repeatedly held that 'where law enforcement officers are jointly involved in an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop.'" *United States v. Acevedo-Vazquez*, 335 F. Supp. 3d 263, 271 (D.P.R. 2018) (Besosa, J.) (quoting *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002)); *see also United States v. Pardue*, 385 F.3d 101, 106-07 (1st Cir. 2004) (quoting *United States v. Paradis*, 802 F.2d 553, 557 (1st Cir. 1996) ("It is enough that the collective knowledge and information of all the officers involved establishes probable cause for the arrest.").

determination — a determination that entails a measurable degree of deference to the perceptions of experienced law enforcement officers.") (internal citations omitted).

Relatedly, the Government contends that the stop of the wrong person (Perez as opposed to Marrero) did not make the intervention unlawful because it was based on a mistake of fact. To be sure, the First Circuit has noted that "[s]tops premised on mistakes of fact. . . , generally have been held constitutional so long as the mistake is objectively reasonable" and that "[a] finding of reasonable suspicion demands only an objectively reasonable appraisal of the facts -- not a meticulously accurate appraisal." *United States v. Coplin*, 463 F.3d 96, 101 (1st Cir. 2006). Indeed, "reasonable suspicion does not necessitate a high degree of certitude[;] there is no requirement that the facts on which it is grounded be unfailingly accurate." *Pontoo*, 666 F.3d at 28. "In carrying out a *Terry* stop, a police officer is not required to possess the clarity of vision that arises only in hindsight." *Id.* (citing *Illinois v. Wardlow*, 528 U.S. 119, 125-26 (2000)). Thus, the Government's point is well-taken.

On the other hand, the Defendant is asking the Court to assess the reasonableness of the intervention based on facts that he is proffering in a vacuum, like the fact that agents should have quickly realized he was not the target fugitive and the fact that there was nothing unlawful or suspicious about his conduct. But the case law is contrary to such approach.

In the context of *Terry*, the court must consider "the totality of the circumstances—the whole picture." *United States v. Sokolow*, 490 U.S. 1, 8 (1989). For example, in *Pontoo*, the appellant argued that there was nothing suspicious about his conduct because "he was simply strolling down the sidewalk at 3:30 in the morning."

*Pontoo*, 666 F.3d at 29. The First Circuit explained that "the lawfulness of the conduct that Officer Maillet observed does not dispel the reasonable suspicion that underpinned the stop. In reviewing a trial court's reasonable suspicion determination, we must take care not to evaluate facts in splendid isolation." *Id.*; *see also United States v. Vaughn*, 429 F. Supp. 3d 499, 507-08 (E.D. Tenn. 2019) (finding a valid *Terry* stop even though the officers detained the wrong person and noting that "[a]fter Detective Ruiz determined Defendant Vaughn was not Young, the officers still had to determine who he actually was and if he was connected to Lytle," the target of the investigation.).

Now, to the extent that the United States is arguing that the police interaction at issue here was merely a consensual encounter and not a seizure of the Defendant, I disagree. While it is true that not every interaction between a police officer and a citizen constitutes a seizure triggering Fourth Amendment protections, *see Florida v. Bostick*, 501 U.S. 429, 434 (1991) (noting that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions, . . ."), the determination hinges on how intrusive the interaction was. "If the encounter amounts to more than a minimally intrusive interaction, a seizure occurs, either a de facto arrest requiring probable cause or an investigative (or Terry) stop necessitating reasonable suspicion." *United States v. Ford*, 548 F.3d 1, 4 (1st Cir. 2008) (citing *United States* v. *Young*, 105 F.3d 1, 6 (1st Cir. 1997)). To effectuate a seizure, the police need not have taken physical custody of an individual. A show of authority suffices when, considering all circumstances surrounding the incident, a reasonable person would believe that he or she was not free to terminate the encounter and walk away. *See United States v. Tanguay*, 918 F.3d 1, 5 (1st Cir. 2019); *see also United States v. Mendenhall*, 446 U.S. 544, 553-54

(1980). Circumstances that might indicate a seizure include: "(1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Smith*, 423 F.3d 25, 29 (1st Cir. 2005) (citing *Mendenhall*, 446 U.S. at 554).

In this case, Agent Morales, flanked by several armed police officers, approached Perez, demanded that he identified himself by providing his driver's license, and physically touched him.  Agent Morales testified that he would not have arrested Perez if he had refused to show his identification but said that depending on how cooperative or uncooperative the Defendant had been, arresting him for obstruction of justice was a possibility. The person next to Perez was arrested and thrown to the ground at the same time officers arrested the Defendant. I find that the circumstances surrounding this interaction do not suggest it was a consensual encounter. In other words, a reasonable person in Perez's shoes would not have believed he or she was free to walk away from the encounter. On the night in question, Perez was subjected to a seizure.[4]

However, as discussed above, the investigative detention was supported by articulable and particularized facts rising to the level of reasonable suspicion. *See Illinois v. Wardlaw*, 528 U.S. at 123 (explaining that all that is needed for a valid *Terry* stop is "a minimal level of objective justification."). Therefore, it did not infringe Perez's Fourth

---

[4] By the same token, I disagree with the Defendant's contention at page 14 of his post-hearing brief (Docket No. 66) that the initial interaction was a de facto arrest.

Amendment rights. "Terry stops must be tailored to fit the exigencies of particular situations, and the mere presence of arrest-like features is not fatal to the validity of a particular stop. The critical consideration is whether the arrest-like features can be reconciled with the limited nature of a Terry stop." *Pontoo*, 666 F.3d at 30 (citing *United States v. Acosta-Colon*, 157 F.3d 9, 15 (1st Cir. 1998)). In conclusion, the intervention with Perez on December 23, 2024, was a valid *Terry* stop based on reasonable suspicion that rapidly evolved into an arrest based on probable cause. *Dancy*, 640 F.3d at 461.

### 2. Agent Morales was objectively justified in believing that Perez was armed and dangerous

The above finding that the initial stop was supported by reasonable suspicion at its inception is not the end of the inquiry; I must still decide if the ensuing pat down/frisk search was lawful. Again, "in determining whether a pat-down search is an appropriate step following a valid *Terry* stop, the key is whether, under the circumstances, 'the officer is justified in believing that the person is armed and dangerous to the officer or others.'" *United States v. Cardona-Vicente*, 817 F.3d 823, 827 (1st Cir. 2016) (quoting *Romain*, 393 F.3d at 71). Courts tackle the question mindful of the reality that *Terry* stops "generally occur in a dynamic environment marked by the potential for violence." *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002); *see also Pontoo*, 666 F.3d at 30 ("In a world fraught with peril, officer safety must have a place at the forefront of police work. It follows logically that a pat-frisk may accompany an investigatory stop whenever an officer has reason to believe that the suspect is armed and dangerous.") (internal marks and citations omitted).

Based on the totality of the circumstances, I find that Agent Morales did not exceed the scope of the initial stop by conducting the frisk because he had reason to believe Perez was armed and dangerous. In fact, almost immediately upon approaching and within seconds of requesting his identification, Agent Morales testified that he observed the contours or "silhouette" of what in his training and experience he identified as the grip of a firearm underneath Perez's shirt. *See Pennsylvania v. Mimms*, 434 U.S. 106-111-12 (1977) (holding that a *Terry* pat-down was justified when officer noticed bulge in suspect's jacket after initiating a traffic stop.); *see also United States v. Scott*, 250 Fed. App'x 534, 535 (4th Cir. 2007) ("Observing a bulge that could be a weapon in a suspect's clothing 'reasonably warrants a belief that the suspect is potentially dangerous.'") (quoting *United States v. Baker*, 78 F.3d 135, 137 (4th Cir. 1996)); *United States v. Carter*, No. 20-14012-CR, 2020 WL 5505449, 2020 U.S. Dist. LEXIS 166598, at * 10-11 (S.D. Fla. Aug. 24, 2020) (citing cases standing for the proposition that the presence of a suspicious visible bulge in a defendant's waistband can form the basis of reasonable suspicion.); *United States v. Elmore*, 382 F. Supp. 3d 136, 142 (D. Mass. 2019) (the observation of a bulge in the front of Elmor's pants combined with the officer's training and experience provided more than reasonable suspicion to frisk the defendant); *United States v. Santiago-Vega*, 228 F. Supp. 2d 2, 8 (D.P.R. 2002) (same).

Defendant offers several reasons why Agent Morales' testimony regarding this observation is not credible. First, he claims it took Agent Morales over 20 seconds to start frisking Perez after he allegedly saw the grip of the firearm through the hoodie. Second, that the blue hoodie he was wearing that night fit him loosely enough that it hung below the waistband thus perfectly concealing the firearm. And third, Perez implies that Agent

25

Morales based his decision to touch (frisk) him because the agent was actually interested in and focused on the fanny pack he was wearing. Neither of these arguments carry the day for the defense.

I find credible Agent Morales' testimony that he observed what appeared to be a firearm underneath Defendant's clothing. To begin with, the video footage in this case shows that there was adequate lighting in the area and that, from his vantage point, Agent Morales had an opportunity to see the silhouette of the grip of a firearm in Perez's waistband. *See United States v. Gatnoor*, No. 24-CR-40038-RAL, 2024 WL 4524480, 2024 U.S. Dist. LEXIS 191729, at *18 (D.S.D. Octo. 18, 2024) (finding credible the testimony of the officer that he observed a bulge in defendant's waistband even though video footage did not capture the bulge itself.). Also, as depicted in Exhibits C, D, and E, the hoodie is not so loosely fitting making it impossible for a bulge to become noticeable and the outline of the grip of a gun to become observable. *Cf. United States v. Mayo*, 960 F. Supp. 2d 419, 422 (E.D.N.Y. 2013) (declining to credit officer testimony that he observed a firearm in defendant's waistband in part because the defendant was wearing a hoodie that hung below the waistband of his pants by a couple of inches and "it would have draped down" over the handle allegedly seen.).

Further, Exhibit 5 (the video), corroborates the testimony of Agent Morales. At 10:26:46, within seconds of Perez pulling out his cell phone with his right hand, Agent Morales is observed attentively looking at the Defendant's waistband. Less than fifteen (15) seconds later, the agent is observed saying something to Perez at the same time he extends his arm to touch Defendant's lower torso area. *United States v. Trullo,* 809 F.2d 108, 113-14 (1st Cir. 1987) ("[once the officer noticed the bulge in appellant's pocket these

generalized suspicions became particularized, permitting the minimal intrusion of a limited search of appellant's outer clothing."). This is consistent with Agent Morales quickly having shifted his focus from ascertaining Perez's identity to his waistband area thus giving credence to his testimony that he did in fact observe the outline of a grip of a firearm through the clothing. Immediately thereafter, Perez is observed reacting to the news of his imminent arrest. The second agent standing behind him is at this point seen putting his hand on Perez's back in what appears to be anticipation of having to subdue him. These events as depicted in the video buttress the testimony of Agent Morales that upon inquiring if Perez had a firearms permit and receiving a response in the negative, the officers sprung into action to secure the weapon and arrest him.

I have not been put in a position to conclude that such characterization of what the video shows is false. Moreover—and this reasoning also applies to my finding above regarding the initial stop—the record does not support a finding that Agent Morales and his fellow PRPB agents had any motive to target Perez. There is no evidence that Agent Morales knew Perez, nor that PRPB agents had received any type of intelligence that they should investigate or intervene with him. It would seem counterproductive that the PRPB agents knowingly and intentionally decided to abandon their efforts to apprehend the real target of that evening's operation—Marrero—in order to intervene with the Defendant without cause and in violation of his Fourth Amendment rights. On this record, and under the totality of the circumstances, I am not prepared to find that Agent Morales lied under oath regarding his observation that Perez was armed. Because the police did not exceed the scope of the Terry stop by frisking Perez, suppression is not warranted.

## V.   CONCLUSION

For the reasons stated, I recommend that Perez's motion to suppress (Docket No. 33) be DENIED.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within 14 days**. Failure to file timely and specific objections is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED**

In San Juan, Puerto Rico this 29th day of December, 2025.

s/Héctor L. Ramos-Vega<br>
HÉCTOR L. RAMOS-VEGA<br>
UNITED STATES MAGISTRATE JUDGE